**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHONG H. KIM,

        Plaintiff,

v.                                  CIVIL CASE NO. 04-60005
                                    HON. MARIANNE O. BATTANI

FRANCIS J. HARVEY,
SECRETARY OF THE ARMY,

        Defendant.

_____/

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment (Doc. #44). Chong H. Kim is a GS-13 employee at the U.S. Army Tank Automotive in and Armaments Command in Warren, Michigan. Kim sued the Secretary of the Army for his alleged discriminatory treatment in violation of the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. §621, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e. Kim claims he was discriminated against when the Army disenrolled from the United States Army's War College in Carlisle, Pennsylvania, and subsequently removed him from the Defense Leadership and Management Program.

Kim was born in Korea on September 4, 1937. He holds various degrees, including a bachelors and masters degree in engineering. He has been employed since 1980 by the Army as a civilian mechanical engineer at the United States Army Tank-Automotive and Armaments

Command ("TACOM"), Tank Automotive Research, Development, and Engineering Center ("TARDEC"), Warren, Michigan.  He attained the rank of a GS-13 employee in 1984.

Kim attempted to advance his career and pay by enrolling in the Army's Defense Leadership and Management Program ("DLAMP").  His application was supported by his supervisors and forwarded with endorsements through his chain of command to both a Department of the Army Secretariat Board, and the DLAMP Council where it was approved.  He was accepted on January 24, 2000.  As part of that program, he attended the prestigious Army War College ("AWC") in Carlisle, Pennsylvania.  He was the oldest student ever admitted to the AWC[1] and the only Korean in his class.

Prior to leaving for the Army War College, TACOM's Chief of Staff, Col. Gary Bishop, suggested that Kim speak with TACOM's Commanding General, General John Caldwell, about Kim's attendance at the AWC.  Col. Bishop and Gen. Caldwell met without him for approximately thirty minutes, at which time Col. Bishop indicated that Gen. Caldwell would not see him.  Kim, as set forth in an affidavit, believes that Gen. Caldwell was upset that he was accepted into the AWC although a younger, white member of TACOM was unable to get in.  He formulated this belief without actually speaking to Gen. Caldwell.  He also stated his belief, unsupported by anything Gen. Caldwell said to him, that Gen. Caldwell was upset with him because he had previously filed successful complaints with the Equal Employment Opportunity Commission ("EEOC").

---

[1] Kim, almost 63, was the oldest student in his class by more than six years.  The average age of the 338 students enrolled in the AWC for the class of 2001 was 44 years and six months.

2

After Kim's acceptance into the AWC, the Army paid his travel expenses, provided him with housing or a housing allowance, and charged him no tuition. The Army also continued to pay his salary for his position at TACOM.

Kim claims that the discriminatory treatment began on his arrival at the AWC. Initially, a member of the intake staff at the registration office told him that there must be a "mistake" in his records, as they indicated a birth year of 1937. She stated that the records should reflect a birth year of 1957.

In August 2000, Kim had a counseling session with Col. Robert A. Kuth, a faculty advisor, because of the poor results he received on his writing evaluation diagnostic. He scored 20 correct answers on the language usage and grammar section out of a possible 50. The median score was 42. There were only two students that scored lower than Kim. Two hundred and sixty-eight students scored higher. His writing diagnostic paper was read by two professors from an outside institution, and both graded the paper a 1 out of a possible 6. During Kim's counseling session, Col. Kuth stated that the results of his poor writing evaluation diagnostic warranted his enrollment in the Effective Writing classes.

Kim only attended two of the eight hours of the Effective Writing course that focused on grammar and language usage. However, he attended eighteen of the twenty hours of the Effective Writing course that focused on the writing process. He willingly contributed to the class sessions when called on; however, his answers were often wrong.

Kim also claims he was treated differently from all of the other students at the AWC with regard to his course work. The courseware consisted of four separate courses, and included both oral and written presentations. The method and grading of course requirements are set forth in

3

the AWC's Student Academic Assessment System.  Grades were given as follows: outstanding ("O"), exceeds standards ("E"), meets standards ("M"), needs improvement ("NI"), and fails to meet standards ("F").  Appendix B of to this document sets forth the "minimum passing profile" for students.  As indicated, an "M" grade coupled with two "NI" grades constitutes an overall "M" or passing grade.

In Course 1, Kim drafted a paper on General Douglas MacArthur's leadership competency and delivered an oral presentation.  On August 30, 2000, he received a Student Assessment Report ("SAR") concerning this paper.  In his SAR, he was given a grade of "M" for preparation and "M" for class participation, but a grade of "NI" for his written paper and oral presentation.  He was given an overall grade of "NI."

On September 7, 2000, Kim attended another counseling session with Col. Kuth.  In this session, Col. Kuth explained to Kim that the overall grade of NI in the Student Assessment Report was a serious matter.  He was also instructed to rewrite his paper and deliver an new presentation by January 22, 2001.

Meanwhile, Kim proceeded on to Course 2.  During one of the lectures regarding events happening in 1960s, Kim claims his instructor, Col. Murdock, stated to him, "You should know this, you're old."

Also during Course 2, he delivered an oral presentation on the strategic plan that won the cold war.  Numerous members of the AWC faculty attended his presentation.  According to Kim, this is the only instance of such an occurrence during his tenure at the AWC.  Twenty minutes into his presentation, one of his two instructors abruptly stopped his presentation.  Again, during Kim's tenure at the AWC, he was the only student whose oral presentation was stopped

4

mid-presentation.  His instructors immediately provided him with an SAR indicating a "NI" for preparation and an overall grade of "F."  In the comment section of the SAR, Col. Murdock noted that Kim failed to use the correct format, failed to address the assigned subject, that his presentation lacked clear structure or purpose, and that his English skills needed improvement. To his knowledge, no other student was immediately graded after their presentation.

Kim challenged this grade and asked to meet with the instructors.  The instructors indicated he should re-present his oral presentation.  He was also told he should do his presentation in his own words and to address the explicitly assigned subject matter of the presentation.

On September 25, 2000, Kim received a Student Assessment Report for Course 2 from Col. Murdock with an overall grade of "F."  That same day, Col. Joseph R. Cerami, sent an email to Dr. William T. Johnsen noting that Kim "is having major difficulties in meeting standards for his oral presentation."

On October 2, another counseling session occurred with Col. Kuth, in which there was discussion of Kim's September 25, oral report in Course 2.  Col. Kuth explained to Kim that he would have to work extremely hard to meet standards.  The next day, Col. Murdock sent Kim an email to confirm that he had agreed to re-present his Course 2 oral presentation on October 16.

On October 6, Dr. Johnsen, an Associate Dean, sent an email to Professor Patricia Pond inquiring how Kim was doing in his writing class and whether Professor Pond was able to assist him in the oral portions of his work.  The same day, Professor Pond sent Kim an email urging him to stop by her office on October 11, for help in coaching him on his presentation, and to schedule a practice presentation on Sunday, October 15.

On November 6, Col. Murdock sent Kim an email asking him to provide information on the status of his rewrite of the Course 2 paper. Col. Murdock sent Kim a second email on November 27, again asking him to provide information on the rewrite of his Course 2 paper.

On December 13, Col. Ralph Ghent sent an email to Col. Murdock informing him that he had met with to discuss his Course 2 paper and the research Kim had done. In the email, Col. Ghent notes that Kim said he had no research concerning his paper and that he could not find any information on the subject. He stated that in only twenty minutes on the computer and looking through his materials that he was able to provide Kim a substantial amount of research.

Meanwhile, Kim also submitted a written report during Course 2 on the Adequacy of Information Operations Doctrine. He was also asked to rewrite this paper. Col. Murdock told him not to start the rewrite until he the two discussed the project. Col. Murdock told Kim that he was available every day of the week, including the weekend, to ensure that Kim was on the right path. Kim was given until December 20 to resubmit the paper. Kim submitted the redrafted paper on time. Col. Murdock graded the resubmitted paper as "NI." Coupled with his grades of "M" for the remainder of the term's work, Col. Murdock initially gave Kim an overall grade of "NI." However, Col. Murdock's supervisor, Col. Joseph Cerami, instructed Col. Murdock to change his overall grade to an "F." Col. Murdock complied.

Kim later learned that Col. Murdock passed his paper around to other instructors for their comments. According to Kim, this was not done to any other student in his class.

On December 28, Col. Joseph R. Cerami sent a memorandum to the Dean of Academics noting that Kim failed to meet standards for his Course 2 paper; that his initial submission was evaluated as a "NI"; that his second submission was also evaluated as "NI"; and,

that he had received help to improve his writing skills, but that he was still having great difficulty meeting the level of quality expected at the graduate level.

Col. Cerami recommended that an Academic Review Board be appointed.  On January 17, 2001, Kim was notified that an Academic Review Board would be convened to determine whether or not he should be disenrolled from the AWC.   The stated reason for the convening of this board was Kim's alleged failure to meet course standards for his Course 2 paper.  A separate memo was made to appoint the board and order that it not convene earlier than January 29, 2001. It was around this time that Col. Johnsen asked Kim to voluntarily withdraw.  Kim refused.

Kim resubmitted his Course 1 paper on January 22, 2001.  Kim's rewritten paper received another "NI."  He received an overall grade of "NI" for Course 1.  The same day, an SAR Form was completed by Col. David W. Foxworth, in which Kim was given an overall grade of "NI" for Course 1.

Kim proceeded to pass Course 3 with grades of "M" in all aspects of the course.  He then proceeded on to Course 4, where he submitted a position paper on unified logistics command. The comments sent back on the position paper indicated a grade of "M" for organization, "— " for style, and "NI" for content.  He was also asked to rewrite this paper.  After consultation with faculty staff, and rewriting the paper, he received a "M" for organization, "NI" for style, and "NI" for content.

On February 6, 2001, an EEOC counselor interviewed Kim as a precursor to filing a complaint of age and race/national origin discrimination for his alleged differential treatment at the AWC.

7

Prior to the academic review board hearing, Kim had a meeting with Col. McCausland, Dean of Academic Affairs, and Col. Kuth. At this meeting, Col. McCausland asked Kim, "Why does TACOM want you to fail at the AWC?" According to Kim, this is when he finally "connected the dots" and got the message that TACOM was sabotaging his efforts.

The Academic Review Board convened on February 20, 2001. Prior to the fact-finding hearing, Kim submitted a package of documents for the board's review, however, according to Kim a board member told him that these documents were not given to the board until the day of the hearing. Also prior to the hearing, Kim requested that the board contain a minority member. This request was refused. The Academic Review Board issued its unanimous findings that:

> 1) Kim failed to achieve the War College's academic standards for written work in Courses 1, 2, and 4 and that this failure could not be offset by other evaluated requirements; 2) he experienced difficulty meeting the War College's standards for oral presentations; 3) he was given two or three opportunities to amend his written submissions in Course 1, 2, and 4 and did so, but was unable to produce a passing product in any of those courses; 4) he has been given extensive assistance far and beyond that afforded most students by various sources within the War College; 5) he is behind on many of his current courses and his Strategic Research Paper; and, 6) based on based performance and pending Army War College requirements, he could not meet the standards for graduation with his class.

Def.'s Ex. 24.

The board recommended that Kim be "disenrolled" from the AWC. He was informed of his disenrollment by letter dated February 28, 2001. The reason given for his disenrollment was his failure to meet academic standards. Kim was the only student disenrolled from the AWC's 2001 class for academic reasons. Subsequently, he filed a formal complaint with the EEOC regarding the circumstances of his disenrollement.

Dr. Johnsen, a member of the Academic Review Board, testified before a Department of Defense Civilian Personnel Management Service Office of Complaint Investigation (OCI) fact

8

finding conference that he had no prior conversations with anyone from Kim's prior command; did not know about his prior EEOC complaints; and, did not consider his age, ethnicity, or national origin when determining the results of the academic review board.

Col. Thomas McShane, another member of the Academic Review Board, testified before the same OCI hearing that the board members had copies of Kim's papers and all his student evaluations. He testified that Kim failed academically and was unable to complete the course work and keep up with the other students. He noted that Kim "failed almost all his written work" and noted that even "his submission to the board again has a lot of grammatical errors." He testified that he had served on other Academic Review Boards for two white males in the past year, which lead to those students being disenrolled. Finally, he testified that Kim's age, race, national origin, and prior EEOC activity had no bearing on the board's decision.

Col. Allen Frenzel, another member of the Academic Review Board testified that as a board member he considered all of the evidence presented by the Kim and the school. He also testified that Kim's age, race, national origin, and prior EEOC activity were not discussed.

Kim appealed the decision to oust him from the AWC, however, the decision was upheld. He also went forward with his EEOC complaint. The EEOC eventually dismissed his claim.

After Kim's disenrollment, he provided DLAMP with a copy of his appeal and informed it that he was disenrolled from the AWC. DLAMP asked him to submit an individual development plan. Kim asserts that he complied with the request. However, in March 2002, he was removed from the DLAMP because he did not submit a good standing assessment report. He informed DLAMP that he never received a request for such a report. Kim alleges DLAMP did not follow proper procedure when it did not send the request for the report directly to his

9

address.  Instead, he states that DLAMP sent the request to his old team leader at TACOM, who did not forward the request to him.

On September 23, 2002, the Department of the Army issued a Final Agency Decision (FAD) concerning Kim's allegations regarding his disenrollment from the AWC.  In the FAD the Army dismissed Kim's allegations, finding no evidence of discrimination.

Kim appealed the FAD to the EEOC, and on July 31, 2003, the EEOC issued a decision affirming the FAD and finding that "the preponderance of the evidence of record does not establish that discrimination occurred."  EEOC Decision of July 31, 2003.  Kim requested reconsideration, but the EEOC denied his request on October 16, 2003.

After his EEOC complaint was dismissed, he filed this suit.  In his amended Complaint, Kim alleges that the Army's decisions to remove him from the AWC and DLAMP were based on age and national origin discrimination, as well as, in retaliation for filing an EEOC complaint in violation of the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964.

## II.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

10

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence itself need not be in the form admissible at trial. Tinsley v. General Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000). However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. Anderson, 477 U.S. at 252.

## III.   ANALYSIS

### A.   Plaintiff's Discrimination Claims

#### 1.   Analytical Framework For Discrimination Cases

The ADEA prohibits an employer from discriminating against its employees on the basis of age. 29 U.S.C. § 623(a)(1). Similarly, Title VII of the Civil Rights Act of 1964 prohibits an employer from making an adverse employment decision based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. Claims of discrimination, based on circumstantial evidence, brought pursuant to the ADEA and Title VII are analyzed under the same framework. Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538 (6th Cir. 2002). Kim has not proffered any direct evidence of age discrimination, and thus, his case is based on circumstantial evidence. In analyzing allegations of age and national origin discrimination based on circumstantial evidence, the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),

12

burden-shifting analysis is followed.  Under that framework, a plaintiff must first establish a

*prima facie* case of discrimination.  <u>Id</u>., at 802.  In general, the  plaintiff "has the burden of

proving by a preponderance of the evidence a prima facie case."  <u>Texas Dep't of Comty. Affairs</u>

<u>v. Burdine</u>, 450 U.S. 248, 252-53 (1981).

> To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff
> must come forward with evidence that: (1) he was at least 40 years old at the time
> of the alleged discrimination; (2) he was subjected to an adverse employment
> action; (3) he was otherwise qualified for the position; and (4) after he was
> rejected, a substantially younger applicant was selected.  <u>Burzynski v. Cohen</u>, 264
> F.3d 611, 622 (6th Cir. 2001) (<u>citing</u> <u>Barnett v. Dep't of Veterans Affairs</u>, 153
> F.3d 338, 341 (6th Cir.1998)).  The fourth element may be satisfied "by showing
> that similarly situated non-protected employees were treated more favorably."
> <u>Talley v. Bravo Pitino Rest.</u>, 61 F.3d 1241, 1246 (6th Cir.1995).

<u>Coomer v. Bethesda Hosp., Inc.</u>, 370 F.3d 499, 510-11 (6th Cir. 2004).

Similarly, to establish a *prima facie* case of national origin discrimination, a plaintiff

must show that: "(1) he or she was a member of a protected class; (2) he or she suffered an

adverse employment action; (3) he or she was qualified for the position; and (4) he or she was

replaced by someone outside the protected class or was treated differently than

similarly-situated, non-protected employees."  <u>DiCarlo v. Potter</u>, 358 F.3d 408, 415 (6th Cir.

2004).

Once a *prima facie* case has been established, the burden then shifts to the defendant to

articulate a legitimate, non-discriminatory reason for the adverse action.  <u>McDonnell Douglas</u>,

411 U.S. at 802.  If the defendant meets this burden, the plaintiff must then show that the

defendant's articulated reason is a pretext for discrimination.  <u>Id</u>., at 804.

   2.  Plaintiff's Claims

Defendant argues that Kim cannot establish a *prima facie* case of age or national origin discrimination because he cannot show his disenrollment from the AWC and removal from DLAMP were adverse employment decisions, and because he cannot show that he was treated differently than a similarly situated individual outside the protected class.

The facts of this case, in which the plaintiff is not eligible for advancement because he did not complete an employer sponsored program, do not lend themselves to a prototypical failure to promote or adverse employment action analysis.  Generally, to establish an adverse employment action, a plaintiff must show that he suffered a materially adverse change in pay, benefits, or duties, or show a loss in prestige in his position because of a change in working conditions or title.  Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886-87 (6th Cir. 1996).  Here, Kim only suffered a materially adverse change in pay in the sense that he did not receive a pay raise upon completion of DLAMP's requirements.[2]  However, even though he was removed from DLAMP, his pay, benefits, title, duties, and working conditions remained the same.

Likewise, this is not a prototypical failure to promote situation, which requires the plaintiff to show that: 1) he is a member of a protected class; 2) he applied, and was qualified for, a promotion; 3) he was considered for and was denied the promotion; and, 4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.  White v. Columbus Metro. Housing Auth., 429 F.3d 232, 240 (6th Cir. 2005).  Here there is no direct application process for the advancement to

---

[2]  The Army notes that Kim could have requested a waiver that would have exempted him from the requirement to file a good standing report.  Def.'s Ex. 29, March 6, 2002, letter to Kim.  Further, the letter suggests that there are other programs that Kim could enroll in to be eligible for advancement.  Id.

GS-14.  There are application processes to get into DLAMP and the AWC.  However, the Army accepted Kim into both.  Nor has Kim argued that an advancement in pay grade has remained open because of his ejection from DLAMP, or that a less-qualified, non-member of the protected class received the advancement in his stead.

Notwithstanding the unusual factual circumstances of this case, the Court finds that Kim did suffer an adverse employment action.  An adverse employment action "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999)(quoting Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)).  In order to determine if a particular employment decision qualifies as an adverse employment action, the Court must take into account such indicators as "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices that might be unique to a particular situation*.'"  Id. (emphasis added)(quoting Crady, 993 F.2d at 136).  Kim argues that he is prohibited from further advancement because the Army saw to his failure at the AWC, and as a result, removed him from DLAMP on the basis of his age and national origin.  In light of the unique circumstances of this case, the Court finds that the indices particular to this situation are sufficient to establish the second prong of a *prima facie* case of discrimination.

However, Kim fails to establish the fourth prong of a *prima facie* case of age discrimination because he has not shown that relatively younger students were treated more favorably.  In order to establish the fourth prong, he must show that relatively younger students

submitted papers and delivered oral presentations that were at a comparable level of academic

performance, but still received passing grades for the courses.[3]

Kim identifies a number of ways in which he claims he was treated differently than

similarly-situated students: his age was questioned when he enrolled and was specifically

referred to in class; he received "NI" or "F" grades even though he passed the "minimum passing

profile" established by the college; his papers were passed around for review to other professors;

his oral presentations were attended and critiqued by many members of the college staff and cut

short; he received "F" grades for his oral presentation immediately; he was instructed to give

presentations in his own words where others were allowed to read their presentations; his grades

were changed to "F" at the behest of Col. Cerami; he was called before an academic review

board; his request to have a minority member on the board was denied; his submission to the

board was not delivered until the day of the hearing; and, he was the only student "disenrolled"

from the AWC for academic reasons.  Thus, Kim asserts that he has shown that all 993 students

younger in these classes received more favorable treatment.

Much of the evidence Kim points to is not indicative of unfavorable treatment.  The

alleged ageist comment by the member of the intake staff at the registration office is not

evidence of age discrimination because the comment does not tend to show that other relatively

younger students were treated more favorably.  Thus, it is nothing more than an isolated,

---

[3] Even though many of Kim's fellow students were in the protected class, the ADEA protects "a relatively old worker from discrimination that works to the advantage of the relatively young."  General Dynamics Land Systems, Inc. v. Cline, 540 U.S. 581, 591 (2004). Thus, the ADEA's protections encompass this situation where a relatively older student, such as Kim, cannot be treated differently from relatively younger students, even if those students are in the protected class.

ambiguous remark unconnected in any way to the alleged discrimination - i.e., it has no connection to the assessment of his academic performance or his removal from DLAMP.  See Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1331 (6th Cir. 1994).

Likewise, the assertion that he received failing grades even though he received marks that meet the minimum passing profile is not evidence of discrimination because that assertion is based on a misinterpretation of the grading system.  The minimum passing profile Kim cites to support his contention is not the profile for a passing grade for the course, but is a profile for evaluating oral and written presentations.  Compare Pl.'s Ex. 4 with Pl.'s Ex. 5.  There is no evidence that receiving grades that meet the minimum passing profile for a written paper or oral presentation guarantees that a student will receive a passing grade for the course as a whole.

Similarly, the remaining instances of alleged discrimination do not establish that other, relatively younger students were treated more favorably.  Kim asserts that his papers were passed around for review, his oral presentations were attended by many members of the faculty, that he was graded  for his oral presentation immediately, and that he was instructed to give presentations in his own words.  However, without more, the Court may not infer that the level of scrutiny Kim's work received was based on age or national origin discrimination.  This is so because the Sixth Circuit has explained that "'the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects' in order for the two to be similarly-situated."  Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003)(quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998)(emphasis in original)(internal quotation marks omitted)).  Thus, in this case, in order to show other younger students were treated more favorably, he must show that he produced the same caliber of work as

another student, and yet the other student did not receive the same level of scrutiny. However, Kim has failed to present any evidence that the work he produced was on par with a comparable, younger student's work, or that such a student did not receive the same scrutiny from the AWC faculty. Without such a showing, the only permissible inference the Court may draw is that the quality of Kim's work prompted that level of scrutiny when other students' work did not. Therefore, Kim has failed to establish a *prima facie* case of age or national origin discrimination regarding his disenrollment from the AWC because of his academic performance.

Kim also claims that his treatment in DLAMP was at odds with that of the other participants because DLAMP ejected him from the program for not submitting a good standing assessment after the AWC disenrolled him. He claims that DLAMP did not contact him directly for a Good Standing Assessment ("GSA"), as it did for other students, but rather, contacted his old supervisor at TACOM who did not forward the request to him.

Penny Berardelli, the person responsible for sending the GSA forms to DLAMP participants, submitted a declaration in which she stated that she sent the GSA tasker to all Army DLAMP participants on May 16, 2001. Decl. of Berardelli, at 1. That tasker included a cover page that reminded the participants that a mass email was sent in January notifying the participants that a Individual Development Plan was due in April and a GSA was due in June 1, 2001.[4] Admin. Record, Vol. III, at 063. Berardelli also stated that she sent the GSA report, via email, to Kim's direct supervisor at TACOM the next day. Id. On June 25, Kim's TACOM

_____

[4] The Court notes that Prior to Kim's departure from Michigan for the AWC his TACOM supervisor was notified that Kim had two official email accounts: one that exceeded storage capacity, containing 1520 unread messages in it, and could not receive any additional email; the other account was within the limits, but had 391 unread messages in it. Decl. of James Kovanda, at 4.

18

supervisor sent a request for an extension to submit the report because Kim had not returned to

work since being disenrolled from the AWC.  Decl. of Kovanda, at 5.  Thus, even looking at the

facts in a light most favorable to Kim, this claim of unfavorable treatment is not evidence of

discrimination based on age or national origin.  Kim offers no evidence, except his statement that

he did not receive the request for a good standing report, that the GSA request was not sent to

him.  His testimony does not establish that the GSA was not sent to him, rather, it establishes

that he did not receive it.  The only person with knowledge of whether a GSA request was sent to

him attested that it was.  Moreover, there is no evidence that GSA requests were only sent

directly to younger, non-protected class DLAMP participants, but not older DLAMP participants

in the  protected class.  Therefore, the fact that Kim did not receive a GSA request at his home[5] is

not evidence of age or national origin discrimination, and Kim fails to establish a *prima facie*

case of discrimination in regard to his removal from DLAMP.

Even if Kim could establish a *prima facie* case of age or national origin discrimination,

Defendant has presented a legitimate, non-discriminatory reason for his disenrollment from the

AWC and removal from DLAMP that he is unable to overcome.  The Sixth Circuit has set forth

what evidence a plaintiff must proffer in order to show that an employer's alleged legitimate

reason for its adverse action against the plaintiff was a mere pretext:

> [T]he plaintiff is required to show by a preponderance of the evidence either (1)
> that the proffered reasons had no basis in fact, (2) that the proffered reasons did

---

[5]  The Court also notes that Kim's supervisor at TACOM, James Kovanda, gave a sworn statement that it was Kim's responsibility to initiate filing the paperwork for his good standing report and Kim's responsibility to keep in touch with DLAMP.  Decl. of Kovanda, at 5.  Thus, it was not DLAMP's responsibility to send the report to Kim, but rather, Kim's responsibility to complete and return the report to DLAMP.

not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). "Summary judgment is appropriate when the plaintiff fails to produce evidence from which a jury could reasonably conclude that the employer's reasons were pretextual." Coomer, 370 F.3d at 511. Thus, at the summary-judgment stage of the proceedings, Kim must set forth evidence from which a reasonable juror could reject the Army's explanations for its decision to disenroll him from the AWC and remove him from DLAMP, and infer that the Army instead made its decision on the basis of his age. Browning v. Dep't of Army, 436 F.3d 692, 696 (6th Cir. 2006).

The Army's stated reasons for disenrolling Kim from the AWC are: 1) he failed to achieve academic standards for written work in courses 1, 2, and 4; 2) he experienced difficulty meeting standards for oral presentations; 3) despite opportunities to amend his written submissions in Courses 1, 2, and 4, Kim was unable to produce a paper that received a passing grade; and, 4) based on past performance and AWC requirements, Kim could not satisfactorily meet the standards for graduation with his class. Def.'s Ex. 24, Academic Review Bd. Memo. The stated reason for his removal from DLAMP is his failure to submit a good standing report.

Kim highlights three pieces of evidence that he believes shows that those stated reasons are a pretext for discrimination. The first piece of evidence is an email sent by the Associate Dean for Academic Policy at the AWC, William Johnsen, to one of Kim's professors, Patricia Pond. In that email, Johnsen noted that "This could turn into a ticklish situation. . . ." Def.'s Ex. 11. However, the entire text of the email message reveals that the message does not harbor any discriminatory subtext:

Pat:

20

How is Mr. Kim doing in writing class?  Also, were  you able to generate
anything to assist him in the oral presentation portions of our work?
I ask that you keep in touch with his FA on all these issues, as I'm sure you are.
This could turn into a ticklish situation, and institutionally we need to provide him
as much assistance as possible.  We don't want to carry him, but assist him.

Id.  The entire text of the email reveals that the ticklish situation Dr. Johnsen was referring to

was how to give Kim enough assistance without actually doing the course work for him.  The

fact that the associate dean wanted the faculty to provide Kim "with as much assistance as

possible" without actually doing the course work for him is not evidence that the Army's stated

reason for its decision to disenroll him from the AWC was pretext for age or national origin

discrimination.

The second highlighted piece of evidence is Pond's testimony on this issue at the

fact-finding conference.  At that conference, Pond testified as follows:

Q: Were any of your actions in the above matters based on his race, national
origin, age or prior EEO activity?
A: Skip prior EEO activity and probably all of them were based on his race,
national origin, age, civilian status, because it's tough for civilians who don't
have a background in the same thing that the military do.  It's a little harder on
them, only insofar as like Course 4, okay, military operations.

Pl.'s Ex. 9, Pond EEO testimony at 338.  However, again, this snippet of testimony is taken out

of context.  When read in light of the preceding question, Pond's answers reveal that the AWC

faculty actually treated Kim more favorably than the typical enlisted students.

Q: Did you have any reason to believe that there was anyone here at the Army
War College staff, that any of the professors or any of the people that dealt with
Mr. Kim or anyone on the academic review board or anyone all the way up, that
they discriminated against him based on his race, his national origin, his age or
took reprisal against him for his prior EEO activity?
A: I didn't know anybody knew about any prior EEO activity, okay.  I saw
absolutely no evidence of anything **except the reverse.**
Q: Were any of your actions in the above matters based on his race, national
origin, age or prior EEO activity?

21

> A: Skip prior EEO activity and probably all of them were based on his race, national origin, age, civilian status, because it's tough for civilians who don't have a background in the same thing that the military do.  It's a little harder on them, only insofar as like Course 4, okay, military operations.
> . . . .
> He's playing the blame game.  If only this, if only that, things would be different.  No, Mr. Kim failed to do his papers and because of that he was dropped from the course.

Id., at 338, 382.  Pond's testimony reveals that the faculty at the AWC treated Kim more favorably by allowing him to rewrite papers and re-deliver oral presentations, because of his civilian status, age, national origin, and race.  The evidence in the record supports Pond's assertions.  The record is replete with evidence that the faculty at the AWC went out of their way to assist Kim with research, writing, suggestions, counseling, coaching, and second chances.  Thus, Pond's testimony does not support Kim's contention that citing his academic performance as the reason the Army disenrolled him was a pretext for discrimination.

The third highlighted piece of evidence Kim cites is a question Col. McCausland posed to Kim in the presence of Col. Kuth: "Why does TACOM want you to fail at the Army War College?"  Dep. of Kim, at p.24; Aff. of Kim, at para. 30.  According to Kim, this statement caused him to finally "connect the dots" and conclude that his efforts at advancement were doomed for improper reasons.  Kim states that this question is an outright admission of impermissible national origin and age discrimination.  See Hunt, 526 U.S. at 553.  When deciding if a comment is evidence of discrimination, the Court must consider "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination."  Cooley, 25 F.3d at 1330.  This comment is merely a vague, ambiguous, and

isolated remark, and is not, in any way, an outright admission of unlawful bias.  The purpose and meaning behind this question is open to interpretation.  Therefore, despite Kim's subjective belief about the meaning of the comment, it is not evidence that the Army's decisions to disenroll him from the AWC and remove him from DLAMP were based on a discriminatory motive.

Kim also cites many of the alleged instances of discrimination discussed above, including the age-related comment made by a member of the intake staff at the AWC and by Col. Murdock.  These isolated and innocuous mentions of age also do not support a finding of a pretext.  See Chappell v. GTE Prods. Corp., 803 F.2d 261, 268 (6th Cir. 1986).  Nor were the two quoted comments regarding Kim's age made in the context of his disenrollment or academic assessment.  Thus, they do not give rise to an inference of ageism, and are not considered evidence of discrimination.  See Cooley, 25 F.3d at 1331.

Similarly, the assertion that his grades met the minimum passing profile established by the AWC, and the scrutiny his work received from the faculty cannot be considered evidence of pretext because he not show that level of scrutiny was unwarranted.  Without showing his work was on par with that of his fellow students, he cannot establish that his discharge for failing to meet academic standards had no basis in fact, did not actually motivate his discharge, or that his performance was insufficient to motivate his disenrollment.

There are three final pieces of evidence that Kim asserts show that the stated reasons for his disenrollment from the AWC and expulsion from DLAMP are a pretext for discrimination: 1) he was the only Korean in his class, and the only student in his class who failed; 2) his ousting from DLAMP is questionable, at best, when he was not notified of the need to file a good

standing form, but was nonetheless ousted for his failure to do so; and, 3) Patricia Pond's testimony that she would have graded Kim's oral presentation less harshly than other instructors at the AWC.  Dep. of Pond, at 320-21.

As discussed above, circumstances involving the Army's requirement to file a GSA, and its alleged failure to send a notice to him directly, cannot be considered evidence of discrimination.  Because the Army's actions in this regard are not evidence discrimination, those circumstances also cannot be used to establish that the Army's stated reasons for removing him from DLAMP are a pretext for discrimination.

Next, when presenting evidence of pretext, the plaintiff must "indict the credibility of his employer's explanation by circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.  In other words, . . . the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or a coverup."  Manzer, 29 F.3d at 1084.  The weight of the two remaining pieces of circumstantial evidence does not make it more likely than not that the Army's explanation for disenrolling him from the AWC and removing him from DLAMP is a pretext or coverup for age or national origin discrimination.  Therefore, the Court finds that Kim has failed to rebut the Army's legitimate, non-discriminatory reason for its actions.

**B.    Plaintiff's Retaliation Claim**

Title 29, section 623(d) of the United States Code makes it unlawful for an employer to discriminate against an employee that "has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  To establish a

24

*prima facie* case of retaliation, a plaintiff must show that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  Allen v. Mich. Dep't of Corr., 165 F.3d 405, 412 (6th Cir. 1987).  After a plaintiff establishes a *prima facie* case, the defendant then has the burden of production of evidence to "articulate some legitimate, nondiscriminatory reason" for its actions.  Morris v. Oldham County Fiscal Court, 201 F.3d 784, 793 (6th Cir. 2000)(quoting McDonnell Douglas, 411 U.S. at 802).  Once the defendant establishes a legitimate, nondiscriminatory reason for its actions, the plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate "that the proffered reason was not the true reason for the employment decision."  Burdine, 450 U.S. at 256.

Because Kim filed discrimination complaints with the EEOC, he has met the first element of engaging in activity protected by Title VII.  To satisfy the second element, the plaintiff must show that "individuals charged with taking the adverse employment action knew of the protected activity."  Mulhall v. Ashcroft, 287 F.3d 543, 551-52 (6th Cir. 2002).  Kim argues that because the Commanding General of TACOM knew of his prior EEOC activity, and because he brought an EEOC representative to the Academic Review Board hearing, he has raised a genuine issue of material fact that the individuals charged with taking the adverse employment action knew of the protected activity.  These assertions are fatally flawed.

Major General Robert Ivany is Commandant of the AWC, and is the "individual[] charged with taking the adverse employment . . . ."  Mulhall, 287 F.3d at 552.  Kim has no evidence that Ivany knew that Kim filed an EEOC complaint prior to the Academic Review

Board hearing regarding his treatment at the AWC, or that he filed previous EEOC complaints during his employment with the Army.  Moreover, Kim did not file his complaint with the EEOC until March 28, 2001, one month after Major General Ivany made the decision to disenroll Kim from the AWC.  Therefore, Kim has not met his burden of showing that his protected activity was known to the person that made the decision, or that there is a causal connection between the protected activity and the adverse employment action, and thus, has failed to establish a *prima facie* case of retaliation as to his disenrollment from the AWC.

David Snyder, Assistant for Civilian Personnel Policy for the Department of the Army is the individual that made the decision to remove Kim from DLAMP.  Looking at the facts in a light most favorable to Kim, Snyder was aware that he had filed a complaint with the EEOC.  However, Kim has presented no evidence that suggests a causal connection between filing the complaints and the adverse employment action.  The temporal proximity between the protected activity and the adverse employment action suggests there is no causal connection.  Kim's removal from DLAMP did not occur until March 6, 2002, almost a year after he filed his most recent complaint.  Further, Kim has not proffered any other evidence that tends to show that the decision to remove him from DLAMP was made to retaliate against him for filing any of his EEOC complaints.  Therefore, Kim has failed to establish a *prima facie* case of retaliation.  Moreover, even if Kim had established a *prima facie* case of retaliation, for the reasons discussed above, he cannot rebut the Army's stated legitimate, non-discriminatory reason for his disenrollment from the AWC or removal from DLAMP.

IV.     CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE



DATED: November 15, 2006


## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.


s/Bernadette M. Thebolt
DEPUTY CLERK

27